**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

_____

Tommie Lowery, Sr., individually, and as Next Friend of
Tommie Lowery, Jr., Isiah Lowery, and Marcus Lowery;
Sandra York; Dorsey Ross, Jr.; Eugene Nelson; and Bernie Nelson,
On behalf of themselves and as Class Representatives of All other
Similarly Situated Plaintiff Putative Class Members,

                              Plaintiffs,                Case No.

vs.                                              Hon.

Lockwood, Andrews & Newnam, P.C., LAN Inc., Leo A. Daily
Company, Veolia North America, LLC, and Veolia Environment
S.A., Rowe, LLC; The State of Michigan and Governor Rick Snyder;
The Michigan Department of Environmental Quality, The Michigan
Department of Health and Human Services, Eden Victoria Wells,
M.D., Stephen Busch, Liane Shekter-Smith, Adam Rosenthal, Patrick
Cook, Michael Prysby, Bradley Wurfel, Daniel Wyant, and Flint
Emergency Managers Edward Kurtz, Darnell Earley and Jerry
Ambrose,

                              Defendants.

_____

## CLASS ACTION COMPLAINT

Tommie Lowery, Sr., Tommie Lowery, Jr., Isiah Lowery, Marcus Lowery, Sandra York,

Dorsey Ross, Jr., and Eugene and Bernie Nelson, individually and on behalf of a class of all

others similarly situated, bring this action for damages and injunctive relief and demand a jury

trial. Unless stated otherwise, all allegations contained herein are made on information and

belief. In support of their claims, Plaintiffs allege as follows:

### I. <u>NATURE OF THE CASE</u>

      1.      Plaintiffs and the Class - all residents and/or businesses and/or property owners of

Flint, Michigan - have suffered, and continue to endure, the consequences of having been exposed to toxic levels of lead and other hazards from the drinking water as a result of defendants' deliberate indifferent, gross negligence, and other misconduct. With this suit, Plaintiffs seek to hold the persons and entities that caused this crisis accountable.

2.    For nearly five years, the City of Flint has existed in a state of financial emergency pursuant to which the City is controlled by a Governor- appointed Emergency Financial Manager. In 2014, in an effort to save money, the Emergency Financial Manager authorized a switch to the Flint River as the City's sole water source.

3.    Defendants were grossly negligent in making and/or approving the April 25, 2014 decision to substitute safe water supplied by the City of Detroit with highly corrosive and hazardous water from the Flint River. By failing to monitor the lead levels of the Flint River water from the individual taps of Flint homes and residences, schools, hospitals, and other public locations, as well as the blood lead levels of Flint's children who were exposed to contaminated Flint River water, Defendants acted in bad faith by falsely assuring Flint residents for many months that the Flint River water coming into their homes was safe to consume and use, when Defendants knew, and had reason to believe, that these assurances were untrue.

4.    As early as 2011 it was known that use of the Flint River as the public source of water without proper anti-corrosive treatment would create a condition dangerous to health and property.

5.    Notwithstanding this knowledge, on April 25, 2014, Flint began to draw water from the Flint River.

6.    Within days of the introduction of Flint River water into the Flint pipelines, the noxious sight, taste, and smell of water flowing from the taps was apparent. Defendants ignored this initial irrefutable evidence that the water they distributed to the City of Flint was highly corrosive,

not fit for human consumption and dangerous for human use and exposure.

7.      During the months following April 25, 2014, evidence mounted that the Flint River water was not only unfit for human consumption, and use,  but was toxic and unsafe, causing lead poisoning of Flint's children and other serious medical conditions to Plaintiffs.

8.      In or about late 2014 or early 2015   a report  disclosed a dramatic spike in elevated blood lead levels in Flint's youngest children as measured by State epidemiologists, with the upward spike coinciding precisely with the time frame that Flint's children were exposed to the Flint River water in their homes, schools and other public locations.

9.      Also by late 2014 or early 2015, further evidence of the toxicity of Flint's water was revealed in water samples showing extraordinarily high levels of lead, as well as dangerously high levels of Trihalomethanes ("THM"), coliform, E. Coli and other bacteria.

10.     A highly publicized media report in October of 2014 stated that General Motors would no longer use Flint River water in its manufacturing facilities because the highly corrosive nature of the water was ruining auto parts and production machinery. In fact, GM rejected the corrosive Flint River water, which resulted in an annual loss of $400,000 to Flint in revenue.

11.     Until October 2015, Defendants continued to falsely assure Flint residents that the Flint River water was being properly treated, monitored and tested and that it was safe to consume and use.

12.     In making this switch, the State of Michigan, the Michigan Department of Environmental Quality (MDEQ), the Governor-appointed Emergency Financial Managers, and various other named employees of those agencies (collectively Government Defendants), failed to implement a corrosion control protocol as required by the Safe Drinking Water Act, and otherwise failed to exercise reasonable care with regard to Flint's water system.  Absent mandatory corrosion

controls, the acidic water of the Flint River coursed through unprotected pipes to residents and businesses - leaching lead and other harmful chemicals into the water along the way.

13.     Flint engaged and relied upon the professional services and expertise of two engineering firms- Defendants Lockwood, Andrews & Newman, Inc. (LAN) and Veolia North America (Veolia) - to review its water distribution system, ensure compliance with federal and state environmental regulations, and provide expert engineering advice to the City and its Emergency Financial Managers. By taking on this assignment, LAN and Veolia assumed the responsibility to satisfy the standard of a reasonable engineer.

14.     In conducting their engineering services, however, LAN's and Veolia's conduct fell well below the standard for a reasonable engineer in several critical respects. First, LAN and Veolia failed to conduct a root cause analysis to determine the cause of Flint's initial water problem. Had either LAN or Veolia performed such an analysis, it would have quickly revealed that Flint River water was contaminated by corrosive salt accumulated from de-icing operations over decades of Michigan winters, and had caused extensive pipe corrosion and an extreme risk of lead contamination absent the implementation of a plan to prevent such contamination. Moreover, a root cause analysis would have revealed that the City of Flint had not adopted a corrosion control protocol as mandated by the federal Safe Drinking Water Act and related Lead and Copper Rule.

15.     Not only did LAN and Veolia fail to perform the routine root cause analysis that would have revealed the City of Flint's lead problems, but they also ignored a series of red flags that should have led them to suspect corrosion problems in Flint's water system. LAN and Veolia should have anticipated widespread corrosion problems in light of the switch to a highly saline water source; the ineffectiveness of Flint's attempts to address coliform bacteria, which would have signaled corroded pipes to any reasonably competent engineer; the summer 2015 outbreak of

Legionnaires Disease, which also should have alerted these companies to corrosion problems; and the very color of Flint's tap water, which was rusty and brown precisely because it was leaching metal from Flint's pipes. Any of these warnings should have warned LAN and Veolia to a widespread corrosion problem and led these companies to implement effective corrosion controls.

16.     Additionally, LAN and Veolia affirmatively recommended that Flint double the ferric chloride in its water. A reasonable professional engineer would have known that ferric chloride is highly acidic and when used without alkaline buffering agents to raise the pH and phosphates or other corrosion control elements to coat the pipes, causes corrosion. This is exactly what happened in Flint's water system.

17.     As a direct and foreseeable result of LAN's and Veolia's recommendations, Flint increased the ferric chloride in its water with grave consequences. The salinity of the Flint River was the metaphorical gasoline in this particular tragedy. The addition of ferric chloride, as recommended by the professional engineers at LAN and Veolia upon whom the City relied, was the match. The added ferric chloride dramatically increased the corrosion of Flint's pipes and, as a direct and foreseeable result, the leaching of various chemicals into Flint's drinking water- including lead.

18.     Despite failing to fulfill their professional duties in a reasonable manner, both LAN and Veolia deemed Flint's water compliant with governing environmental statutes and regulations. In doing so, LAN and Veolia provided false assurances of safety to Plaintiffs and the Class, further exacerbating the extent of the damage caused by their conduct.

19.     As concerns began to emerge that Flint's water was contaminated with lead and other hazardous materials, the Government Defendants engaged in various activities designed to deny or minimize the existence or extent of Flint's corrosion and lead problem. For example, the MDEQ misrepresented its water samples as being compliant with federal regulations when, in fact, the

samples were drawn from locations that were less likely to show lead contamination. Moreover, various MDEQ officials "scrubbed" test results to remove certain results that showed high levels of lead in the water.  Additionally, when the EPA inquired as to what corrosion control treatment Flint was using, Defendant Stephen Busch of the MDEQ unequivocally and falsely assured the EPA that Flint was adding phosphates to its water to control corrosion.  Other MDEQ officials similarly misled the public by falsely stating that Flint's water system had a corrosion control protocol. MDEQ officials also baselessly informed the EPA that the first resident's water had tested positive for lead due to sources within the home - a statement that was later proved entirely incorrect when the EPA visited the resident's home and discovered it had plastic pipes.

20.    After Flint switched its water source to the Flint River, the City also suffered an outbreak of Legionnaires' disease, a severe form of bacterial pneumonia caused by toxins in the contaminated water. According to Michigan health officials, this outbreak was one of the worst in U.S. history: 87 confirmed cases and 9 Legionnaires' -associated deaths. Yet, the Government Defendants did not even disclose that the outbreak had occurred until January 2016 -months after it began. The Government Defendants thus failed to warn Flint residents of the threat posed by Legionella in the City's water supply and failed to take reasonable steps to contain the outbreak once it began.

21.    All the while- despite public assurances of safety- government offices in Flint quietly switched to bottled water while the citizens and business of Flint continued to drink dangerously contaminated water.

22.    Indeed, it was not until a memorandum from an EPA official regarding the frightening existence of lead in Flint's drinking water was leaked to the American Civil Liberties Union that any of the Government Defendants acknowledged the problem.

23.     Unfortunately, these acknowledgments came too late.  Since the Government Defendants implemented LAN's and Veolia's recommendations, more than 40% of the homes tested revealed lead contamination above the federal threshold and a study from a pediatrician at the Hurley Medical Center showed that elevated blood levels in children had more than doubled following the switch to the Flint River as Flint's water source.

24.     The consequences of lead exposure are both catastrophic and permanent.  Lead poisoning can cause serious damage to a child's central and peripheral nervous system, stunt growth, impair hearing, and impair the formation and function of blood cells.  The effect of lead poisoning on children's brain development is particularly alarming, causing reduced IQ and serious behavioral problems.  While lead's worst effects are borne by children, lead exposure can be seriously harmful to adults as well causing serious cardiac and reproductive problems.

25.     Plaintiffs and the Class have sustained substantial personal injuries as a result of Defendants' conduct and the child-members of the Class have additionally suffered lost economic earnings.

26.     Plaintiffs and the Class have also suffered significant property damage as a direct result of Defendants' conduct.  The acidic and corrosive water that Defendants caused to flow through Flint's pipes and appliances has irreparably damaged residents' and businesses' pipes and appliances.  Moreover, the stigma associated with the water crisis has resulted in, and will continue to result in, a reduction in residential and commercial property values in the City of Flint and substantial financial harm to Plaintiffs and the Class.  Despite Flint having switched back to its prior water source, corroded pipes and appliances in residents' homes and local commercial properties remain corroded.  The only option for Plaintiffs and the Class to truly be safe is to entirely replace their pipes and corroded appliances.

27.     In addition to injunctive relief under the Safe Water Drinking Act, Plaintiffs and the Class also seek damages and other relief under theories of Professional Malpractice, Gross Negligence, Negligence, Intentional and Negligent Infliction of Emotional Distress, Inverse Condemnation, Trespass, Nuisance, Breach of Contract, Unjust Enrichment, Due Process, and the Declaratory Judgment Act.

28.     Given the devastating, permanent effects of lead exposure, and the severe health risks that would be presented by the continued presence of Legionella in the Flint water supply, it is imperative that Defendants' conduct related to the Flint Water Crisis be fully investigated and Defendants be held accountable to the extent they caused Plaintiffs and the Class injury. That is exactly what this suit seeks to do.

## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, for cases concerning federal questions and 28 U.S.C. §§ 2201-2202, for cases invoking the Declaratory Judgment Act. Additionally, this Court has subject matter jurisdiction over this civil action pursuant to the Safe Drinking Water Act, 42 U.S.C. § 300j- 8(a), and the Lead and Copper Rule, 40 C.F.R. §§ 141.80-91.

30.     This Court has supplemental jurisdiction of the pendant state-law claims under 28 U.S.C. § 1367.

31.     This Court also has diversity jurisdiction under 28 U.S.C. §1332(d). The matter in controversy in this suit exceeds $5,000,000, exclusive of interest and costs. This is a class action in which at least one Plaintiff, Tommie Lowery, Sr., is a citizen of the State of Michigan, and at least one defendant is a citizen of a different state- in particular, Defendant LAN is a citizen of the State of Texas, and Defendant Veolia is a citizen of the States of Delaware and Illinois.

32.     Venue is proper in this Court because Plaintiffs' and Class Members' claims arose in

this judicial district, in Flint, Genesee County, pursuant to 28 U.S.C. §§ 102, 139l(b).

33.     This Court has personal jurisdiction over each Defendant because a Michigan Court would have personal jurisdiction under Mich. Comp. Laws § 600.701 and Mich. Comp. Laws § 600.705.

34.     This case arises out of the actions and decisions made by the State of Michigan and its actors, including Governor Rick Snyder and Flint Emergency Managers Edward Kurtz, Darnell Earley and Jerry Ambrose, the Department of Environmental Quality ("MDEQ"), and the Michigan Department of Health and Human Services ("MDHHS"), acting in their official capacities which resulted in the contamination of Plaintiffs' water supply, and their exposure to toxic and hazardous substances, in their homes, schools, hospitals, workplaces and other public forums.

### III. Parties

#### A.     Plaintiffs

35.     Plaintiff Tommie Lowery, Sr., and minor plaintiffs Tommie Lowery, Jr., Isiah Lowery, and Marcus Lowery reside, at all times relevant hereto resided, at 4820 Winthrop Blvd in Flint, Michigan, which is owned by Tommie Sr. and serviced by water provided by the City of Flint. The Lowerys have suffered damages as a direct and proximate result of defendants' conduct described herein, including but not limited to:

   a.  Exposure to lead and the presence of lead in the blood and body;

   b.  significant emotional distress and mental pain;

   c.  unreasonable interference with all aspects of daily living, quality of life and use and enjoyment of their property, and substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

36.     Plaintiff Sandra York resides, and at all times relevant hereto resided, at 902 Barrie Avenue in Flint, Michigan, which she owns and which is serviced by water provided by the City of Flint.  York has suffered damages as a direct and proximate result of defendants' conduct described herein, including but not limited to:

    a.   Exposure to lead and the presence of lead in the blood and body;

    b.   significant emotional distress and mental pain;

    c.   unreasonable interference with all aspects of daily living, quality of life and use and enjoyment of their property, and substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

37.     Plaintiff Dorsey Ross, Jr. resides in Grand Blanc, Michigan and owns rental properties located at 4204 Park Forest Drive and 2024 Stoney Brook Circle in Flint, Michigan, which are serviced by water provided by the City of Flint.  Ross has suffered damages as a direct and proximate result of defendants' conduct described herein.

38.     Plaintiffs Eugene and Bernie Nelson are married and live in Flint Township. Together they own rental properties located at 300 E. Newall Street and 6401 Karen Street in Flint Michigan, which are serviced by water provided by the City of Flint.  Eugene Nelson individually owns rental properties located at 215 E. Hamilton Avenue, 205 E. Hamilton Avenue, and 4213 Carlton Street in Flint Michigan, which are serviced by water provided by the City of Flint.  The Nelsons have suffered damages as a direct and proximate cause of defendants' conduct described herein.

**B.    Defendants**

<u>**MDEQ**</u>

39.    Defendant Michigan Department of Environmental Quality ("MDEQ") is the State Agency responsible for implementing safe drinking Federal and State water laws, rules, and regulations in Michigan, including the City of Flint, Michigan.

40.    MDEQ failed to require corrosion control for Flint River water in violation of the Federal Lead and Copper Rule.

41.    MDEQ misled the Environmental Protection Agency ("EPA") which, on numerous occasions, attempted to sample the water quality in Flint, Michigan.

42.    MDEQ conducted illegal and improper sampling of Flint's water and lied to, and mislead the public about the safety of Flint's water.

43.    MDEQ publicly discredited experts Miguel Del Toral of the EPA and Dr. Mark Edwards of the Virginia Polytechnic Institute and State University, who proffered indisputable evidence of Flint's water contamination.

44.    Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Liane Shekter-Smith, and Adam Rosenthal are, or were at all relevant times herein agents and employees of the State of Michigan employed by the MDEQ, and acting within the scope of their respective employment and authority.

45.    Daniel Wyant ("Wyant") was at all relevant times the Director of MDEQ. MDEQ, through Wyant, participated in the decisions that deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative. Further, MDEQ, through Wyant, assured Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that this assurance

was false.

46.     MDEQ, acting through its agents identified hereinabove and below, as set forth below, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when on notice of the dangers associated with same

    a.   Stephen Busch ("Busch") was at all relevant times District Supervisor assigned to the Lansing District Office of the MDEQ and was acting within the scope of his employment and/or authority. MDEQ, through Busch, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when he was on notice of the dangers associated with same.

    b.   MDEQ, through Busch, further falsely reported that anti-corrosive agents had been used to treat the highly corrosive Flint River water and thereby provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

    c.   Patrick Cook ("Cook") was at all relevant times Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ and was acting within the scope of his employment and/or authority. Cook, knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when he was on notice of the dangers associated with same.

    d.   Cook further failed to properly monitor and test the Flint River water, he falsely reported to the EPA that the Flint River water was treated with anti-corrosive

chemicals, and he provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

e.  Michael Prysby ("Prysby") was at all relevant times Engineer assigned to District 11 (Genesee County) of the MDEQ and was acting within the scope of his employment and/or authority. Prysby knowingly created, increased and prolonged the hazards, threats and dangers to Plaintiffs and the public by approving the decision to switch the water source when he was on notice of the dangers associated with same. Further, MDEQ failed to properly monitor and test the Flint River water and provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

f.  Bradley Wurfel ("Wurfel) was at all relevant times the Director of Communications for MDEQ and was acting within the scope of his employment and/or authority. Wurfel was forced to resign on December 29, 2015 due to his "persistent [negative] tone and derision" and his "aggressive dismissal, belittlement and attempts to discredit the individuals involved in [conducting independent studies and tests]."March 2016 Flint Water Advisory Task Force Final Report, p. 2, available athttps://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_5178057.pdf.

g.  Wurfel, as Director of Communications, was responsible for the deliberate, misleading and inaccurate communications that increased and prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic

alternative. He further knowingly provided false assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice, and/or had reason to believe, that these assurances were false.

h.   Liane Shekter-Smith ("Smith") was at all relevant times Chief of the Office of Drinking Water and Municipal Assistance for MDEQ and acting within the scope of her employment and/or authority, holding that position until October 19, 2015. Smith knowingly approved of, and thereby participated in, the decisions that created, increased and prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative. She further provided false assurances to Plaintiffs and the public that the Flint River water was safe when she was on actual notice and/or had reason to believe that these assurances were false.

i.   Adam Rosenthal ("Rosenthal") was at all relevant times a Water Quality Analyst assigned to the Lansing District Office of the MDEQ and acting within the scope of his employment and/or authority.

j.   Rosenthal, as Water Quality Analyst for the MDEQ, knowingly approved of, and thereby participated in, the decisions that created, increased and prolonged the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative. He further provided assurances to Plaintiffs and the public that the Flint River water was safe when he was on actual notice and/or had reason to believe that these assurances were false.

**MDHHS**

47.   The Michigan Department of Health and Human Services ("MDHHS") is the State Agency responsible for protecting the health and well-being of Michigan residents.

14

48. Eden Victoria Wells, M.D. ("Wells") was at all relevant times herein an agent and employee of the State of Michigan employed by Defendant MDHHS, and acting within the scope of her respective employment and authority.

49. Wells was at all relevant times Chief Medical Executive within the Population Health and Community Services Department of the MDHHS and was acting within the scope of her employment and/or authority. Through Wells, MDHHS knowingly created, increased and prolonged the hazards that arose from replacing safe drinking water with a highly toxic alternative. Through Wells, MDHHS knew as early as 2014 about the highly unusual spike in elevated blood lead levels and cases of Legionella bacteria in Flint water users and, notwithstanding a legal duty to notify the public, failed to do so, and instead concealed these facts from Flint residents, including Plaintiffs.

50. Nick Lyon ("Lyon") was at all relevant times herein an agent and employee of the State of Michigan employed by MDHHS, and acting within the scope of his respective employment and authority.

51. Lyon was at all relevant times Director of the MDHHS and was acting within the scope of his employment and/or authority. Through Lyon, MDHHS knowingly created, increased and prolonged the hazards that arose from replacing safe drinking water with a highly toxic alternative. Through Lyon, MDHHS knew as early as 2014 about the highly unusual spike in elevated blood lead levels and cases of Legionella bacteria in Flint water users and, notwithstanding a legal duty to notify the public, failed to do so, and instead concealed these facts from Flint residents, including Plaintiffs.

## The City of Flint Emergency Manager Defendants

52.     Defendant Emergency Manager Ed Kurtz ("Kurtz") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder in 2012, and served in this capacity until November 1, 2013.Kurtz is and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.  He is sued in his individual and official capacities.

53.     Defendant Emergency Manager Darnell Earley ("Earley") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on November 1, 2013, and served in this capacity until January 12, 2015. Earley is, and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately created, increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.

54.     Defendant Emergency Manager Gerald Ambrose ("Ambrose") was the City of Flint Emergency Manager appointed by Michigan State Governor Rick Snyder on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is and was at all relevant times a public official who acted in concert with Defendants during his term as Emergency Manager of Flint when he knowingly and deliberately increased and prolonged the hazards, threats and dangers that arose due to the replacement of safe drinking water with a highly toxic alternative.

55.     Defendants Early and Ambrose (the "Emergency Managers") continuously controlled all the Flint governmental functions, decisions and fiscal decisions from December 2011 through April 30, 2015 pursuant to State Statute.

56.     The  Emergency Managers at all times relevant hereto were acting within and outside the scope of their employment and/or authority under color of law.

57.     The Emergency Managers named herein are sued in their official capacities. The Defendants Emergency Managers acting in concert with  MDEQ, and MDHHS made the decision to switch to Flint River water and enabled Flint's water treatment plant from not properly analyzing and treating this water with an anti-corrosive, and  making it safe.

58.     The Defendant Emergency Managers ignored warning signs and were integral in defrauding, misrepresenting and falsifying information relating to the property and financial affairs of Flint as it affected its citizenry.

59.     Defendant Emergency Managers provided assurances to Plaintiffs and the public that the Flint River water was safe when they were on actual notice and/or had reason to believe that these assurances were false. Through these false representations, Defendants Emergency Managers permitted the Flint River water to poison thousands of Flint residents and damage Flint homes.

60.     Defendant Ambrose at all relevant times was in a positon to prevent the water shut-offs, and void the water bills for useless, toxic, and harmful water.

### The State and the Governor

61.     Defendant Rick Snyder is the Governor of Michigan and is invested with executive power pursuant to Article V, Section 1, of the Michigan Constitution.  The Governor is and was at all relevant times the official policy-maker for Defendant State of Michigan, and, as such, was responsible for the management of State government and for the health and welfare of its citizens and residents, and is sued by plaintiffs in his official capacity.

62.     Defendant State of Michigan operates the MDEQ and MDHHS.

63.     Defendant State of Michigan, acting through the Governor's office, and/or the

MDEQ, MDHHS, and its official policy-makers, and/or Defendants Kurtz, Early, and Ambrose, made the final decisions that deliberately created, increased, and/or prolonged the hazards, threats, and dangers that arose by replacing safe drinking water with a highly toxic alternative and affirmatively acting to fraudulently conceal the public health emergency they created and/or failed to take adequate steps to remediate and abate.

64.     Only prospective relief is sought from defendants Snyder and the State of Michigan.

**Private Engineering Defendants**

65.     Defendant Rowe f/k/a Rowe Engineering, Inc. ("Rowe") is a Michigan Corporation with its principal place of business located at 540 S. Saginaw Street, Suite 200, Flint, Genesee County, Michigan 48502.

66.     Rowe maintains an office in Flint, Genesee County, Michigan, regularly conducts business in Flint, Michigan, and has committed torts in Flint, Michigan, which are among the basis for personal jurisdiction under MCL 600.705.

67.     Rowe falsified information and ignored warning signs related to the hazards, threats and dangers that arose by replacing safe drinking water with a highly toxic alternative.

68.     Rowe is a private individual Defendant in this action based on its examinations, findings, and reports as related to the condition of the Flint River and the Flint Water Treatment Plant.  Specifically, Rowe is liable for its grossly negligent conduct, including declaring the Flint River water as safe to drink, recommending approval of the use of Flint River water in the Flint Water Treatment Plant, and falsely representing that the connection between the Flint River and the Flint Water Treatment Plant had been performed properly and safely. Rowe's conduct caused significant harm to Plaintiffs persons and property.

69.     Defendant Lockwood, Andres & Newnam, P.C., ("LAN") is a Michigan professional corporation based in Flint, Michigan.  Upon information and belief, LAN was incorporated in 2008 by Lockwood, Andres & Newnam, Inc. after it was retained by Defendants to conduct studies of and reports on the feasibility of a new water supply for the City of Flint. LAN was hired by Defendants to provide professional engineering services to place the Flint Water Treatment Plant into operation for using the Flint River as a primary water drinking source, and to continue to operate the Water Treatment Plant to maintain the delivery of the Flint River-sourced water to Flint.

70.     LAN Inc. is a Texas corporation with its principal place of business at 2925 Briarpark Drive, Suite 400, Houston, Texas 77042. At all relevant times, hereto, LAN Inc. conducted business in Genesee County through Defendant LAN P.C., at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. is a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design.

71.     Leo A. Daly Company ("LAD") is a Nebraska corporation with its principal place of business at 8600 Indian Hills Drive, Omaha, Nebraska 68114. LAD is an international architecture/engineering firm, with nearly 800 professionals in 31 offices worldwide and projects in more than 87 countries and all 50 US states. Upon information and belief, LAD is the parent company of LAN Inc. and LAN P.C.

72.     Defendants Veolia North America, LLC, is a Delaware corporation with its principal place of business in Illinois, and Veolia Environment S.A. (hereinafter collectively "Veolia") is a French transnational corporation with its principal place of business in Paris, France.  Veolia provides water, waste, and energy management solutions to communities and industries.  Veolia was

retained to provide additional review and recommendations on Flint's water treatment and delivery.

## IV.   Statement of Factual Allegations

### A.        Background On Decision to Change Water Sources

73.     From 1964 to 2014, Flint water users received their water from Lake Huron via the Detroit Water and Sewage Department.  During this 50-year span, the Flint water users enjoyed safe, clean, fresh water in their homes, businesses, schools, hospitals and other places of public services.

74.     Motivated principally by the actions, political pressure and efforts of Genesee County Drain Commissioner Jeffrey Wright, in 2009, the communities of Flint, Genesee County, Sanilac County, Lapeer County and City of Lapeer, formed the Karegnondi Water Authority ("KWA") to explore the development of a water delivery system which would draw water from Lake Huron and serve as an alternative to water delivered by the DWSD.

75.     In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as a primary source of drinking water.  The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Defendants Rowe and LAN, provided that Flint River water and the dormant Flint Water Treatment Plant ("FWTP") could be used to supply water to the City, if millions of dollars were spent to upgrade the WTP and implement necessary water quality control measures, including adding anti-corrosive treatments to Flint River's highly corrosive water.[1]

76.     Use of the Flint River as a primary drinking source was rejected in 2011.

77.     In August 2012, the Governor appointed Edward Kurtz as Flint's Emergency

---

[1] See March 2016 Flint Water Advisory Task Force Final Report ("Task Force Report"), Integrated Event Timeline, p. 2, available at
https://www.michigan.gov/documents/snyder/FWATF_FINAL_REPORT_21March2016_517805_7.pdf.

Manager.

78.     Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint needed to reject Wright's pressure to join KWA and continue to receive water from DWSD.

79.     Most, if not all, discourse about Flint joining KWA or continuing with DWSD, included Wright who consistently raised arguments designed to persuade Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

80.     In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJR") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join KWA water delivery system.

81.     In February 2013, TYJR concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD.

82.     On March 27, 2013, MDEQ officials, aware that Kurtz, Wright, Walling and Dillon were pushing the Governor to approve Flint joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water.[2]

83.     On March 28, 2013, in an email from Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize KWA going forward, even though the independent firm he hired to perform a cost evaluation

---

[2] *Id.*, *see* Task Force Timeline. Sygo/MDEQ e-mails with Busch re: Flint River water source switch. "As you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost." Task Force Timeline at 4.

said staying with the DWSD made the most economic sense.[3] Dennis Muchmore, Governor Snyder's Chief of Staff, confirmed in a subsequent email that it was Dillon who made "the ultimate decision" to switch Flint water from the DWSD to the KWA.

84.     On April 11, 2013, Dillon, in what is now understood to be a non-fiscal decision, authorized Kurtz to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016, subject to getting a last best offer from DWSD.

85.     Governor Snyder participated in discussions between his appointed emergency Manager of Flint, Mr. Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr. At the time Dillon authorized his Emergency Manager to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River would be used as an interim source.

86.     In or around June 2013, the City of Flint hired LAN to advise Flint about the use of the Flint River as the City's primary water source during the construction of the new KWA treatment plant, which was projected to take approximately two years.

87.     Although Flint recognized that water from the Flint River "would be more difficult to treat," the City concluded, based in part on LAN's recommendations, that the Flint River was "viable as a source" of public water.

88.     On June 26, 2013, the City of Flint entered into a Resolution to switch over to the Flint River in April of 2014, and authorized action to prepare the FWTP in anticipation of using the Flint water as the primary water source.

---

[3] Dillion stated in his March 28, 2013 email: "Governor, based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email."

89.     Later, the City of Flint hired LAN to place the FWTP into full-time operation using the Flint River as a primary drinking water source.

90.     LAN continued to advise Flint about its transition to Flint River water through 2015, and ultimately was paid more than $3.8 million for its services.  LAN advised City officials that the Flint River water was safe.

91.     In June 2013, Dillon Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational.  The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October 2016).

92.     Dillon, Kurtz, Wright and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the Flint WTP would cost millions.

93.     When the Governor authorized the use of the Flint River as an interim source of water for Flint, he knew that in 2011 the use of the Flint River water as a primary drinking source had been professionally evaluated and rejected as dangerous and unsafe.

94.     The Governor, in a timeline prepared by his office, confirmed that in June 2013, he knew that Flint River water would be used as an interim source of water.[4]

95.     In May 2013, emergency Manager Kurtz announced his resignation effective July 2013.  The governor reappointed Michael Brown as Flint's Emergency Manager.

96.     In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

97.     Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that the WTP was not fit to begin

---

[4] "City of Flint decides to use the Flint River as a water source, per Gov. Snyder timeline."  Task Force Report at 5.

operations and that "management" was not listening to him because "they seem to have their own agenda."[5]

**B.** **Flint River Used as Flint Water Source**

98.　　On April 25, 2014, under the direction of Emergency Manager Earley and the MDEQ defendants, Flint water users began receiving Flint River water from their taps even though Glasgow warned that the WTP was not ready.

99.　　Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it and Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the WTP was not ready.

100.　　For at least a year prior thereto, the State, particularly the MDEQ and MDHHS defendants, knew that using the Flint River water was dangerous and could cause serious public health issues.[6]

101.　　No corrosion control was put in place prior to, or after April 25, 2014.

102.　　Defendants were fully aware – prior to April 25, 2014 – that the required and necessary anti-corrosive treatment was not being used during the distribution of Flint River water to Flint residents, families, and home owners, including Plaintiffs.

103.　　Within days after the April 25, 2014 switch, State Actors began receiving complaints

---

[5] Glasgow said on April 16, 2014 that " … it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible …. I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote Prysby and Busch of the MDEQ, that " … I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."
[6] "January 23, 2013: Mike Prysby/MDEQ emails colleague Liane Shekter Smith and others about feasibility of Flint switching to the Flint River, highlighting water quality concerns." Task Force Report at 16.

from water users, including some or all of the Plaintiffs herein, that the water was cloudy and discolored in appearance and foul in taste and odor.

104.     Within weeks after the April 25, 2014 switch, water users, including some or all of the Plaintiffs herein, were reporting to the State Actors that they were experiencing hair loss, rashes, vomiting and other physical maladies.

105.     Over the course of the next eight (8) months, Flint water users continued to express their concerns about water quality in multiple ways including letters, e-mails and telephone calls to Flint officials, the media and through well publicized demonstrations on the streets of Flint.

106.     As early as May 2014, the State knew that it had indeed created a dangerous public health crisis yet failed to take any remedial steps.[7]

107.     In June 2014, citizen complaints about contaminated water continued and the State failed to do anything to address these complaints.  Many Flint water users reported that the water was making them ill.

108.     On October 2014, Flint's public health emergency was a topic of significant discussion in the Governor's office.  Valerie Brader, State Deputy Legal Counsel and Senior Policy Advisor, emails [on October 14th the] Governor's Chief of Staff Dennis Muchmore and other top aides arguing for a return to DWSD because of water quality problems.  Michael Gadola, then the governor's Legal Counsel, responds by agreeing with Brader.  Brader and Rich Baird, another senior aide to the Governor, then discuss the idea with Emergency Manager Darnell Earley, who maintains the water quality problems can be solved and it would be cost-prohibitive to return to DWSD.[8]

---

[7] The Governor's office received citizen complaints and was well aware of numerous press stories about water quality problems as early as May 2014 and continuing throughout 2015."  *Id* at 36.
[8] *Id*. at 17-18.

109.     By October 2014, the Governor and his staff knew full well of the on-going public health threat to the people of Flint yet he did absolutely nothing to assist the desperate situation for the people of Flint.[9]

110.     On October 13, 2014, the General Motors Corporation announced that it would no longer use Flint River water in its Flint plant because of, among other things, its corrosive qualities.  Despite this clear evidence of serious and significant danger, none of the Defendants took any action to alter the course of the health crisis.[10]

111.     On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

### C.     Lead Contamination

112.     Most of Flint's 550 miles of water mains are over seventy-five years old and constructed of cast iron piping.  Cast iron pipe is subject to internal corrosion, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage.  This corrosion also encourages layers of bacteria to attach to the inner pipe wall.

113.     State Actors herein were on actual notice and/or knew that the water supplied by Detroit included corrosion control treatment chemicals which prevented the leaching of lead from lead pipes found in many of the Flint residents' water systems.

114.     Defendants herein knew that, as a consequence of the failure to use the required and

---

[9] The Task Force Report was critical of the Governor's failure to answer the Flint citizen calls for help in October of 2014.  "The suggestion made by members of the Governor's executive staff in October 2014 to switch back to DWSD should have resulted, at a minimum, in a full and comprehensive review of the water situation in Flint, similar to that which accompanied the earlier decision to switch to KWA.  It was disregarded, however, because of cost considerations and repeated assurances that the water was safe.  The need to switch back to DWSD became even more apparent as water quality and safety issues continued and lead issues began to surface in 2015, notwithstanding reassurances by MDEQ."  *Id*. at 38.

[10] "GM announces it is switching from City of Flint water system to Flint Township (Lake Huron) water for its Flint Engine Operations facility until KWA connection is complete, citing corrosion concerns.  Prysby/MDEQ notes Flint water chloride levels are "easily within" public health guidelines.  Annual revenue loss of $400,000.  *Id*. at 7.

necessary anti-corrosive agent in the Flint River water, Plaintiffs were being exposed to toxic levels of lead and other metals, chemicals and bacteria.

115.    In October 2014, a media report covered General Motors' decision not to continue using Flint River water in its manufacturing facilities because the highly corrosive nature of the water was ruining auto parts and production machinery.

116.    This report also served to alert Defendants that Flint water was unfit for human exposure and consumption.

117.    In accordance with the Federal Lead and Copper Rule ("LCR"), all large public water systems, including Flint's, are required to install and maintain corrosion control treatment for lead and copper water service systems.

118.    MDEQ failed to require that Flint determine and establish water quality standards, including corrosion control treatments, in violation of the LCR.

119.    As a direct and proximate result of the failure to use corrosion control treatment, water coming from lead and copper based water systems contained lead at unacceptably high levels.

120.    The MDEQ required Flint to conduct two six-month rounds of testing for lead and copper (July-December 2014 and January-June 2015) in homes that were identified as "Tier 1" sample sites (sites with known lead plumbing and/or service lines), for the presence of lead or other heavy metals.

121.    The foregoing testing employed seriously flawed testing and notification methods, including but not limited to:

a.    Instructing water users to pre-flush the system before drawing a water sample,

b.    Failing to positively identify Tier 1 sample sites (sites with known lead plumbing and/or service lines),

c.    Failing to include at least 50% Tier 1 homes in the sample study,

d.       Failing to use the same testing sites from one test to the next (the second round of testing covered only 13 sites which had been tested in the first round,

e.       "Cherry-picking" the sites to be tested by excluding the homes that had tested with the highest parts per billion during the first round from being re-tested in the second round), thereby rejecting without cause those homes with elevated lead level readings, and

f.       Failing to notify residents, including Plaintiffs, when elevated levels were found.

122.     MDEQ received the results of the first round of water sampling tests by March 2015 which revealed  lead levels in excess of the minimal action levels, i.e. 15 parts per billion ("ppb").

123.      Accordingly, MDEQ and the MDEQ defendants knew, and were on notice by early March 2015, at the latest, that it could not achieve two consecutive testing periods below the action level (as required by the LCR protocol) and were thus required to notify Flint to commence and pursue corrosion control treatments.  MDEQ failed to immediately require Flint to commence and pursue corrosion control treatments.  Contrary to water quality standards and common sense, the State Actors failed to evaluate the quality of the "treated" Flint River water as it came out of the consumers' tap before substituting high quality Detroit water with questionable quality Flint River water.

124.     Indeed, according to a December 23, 2015 State Auditor General Report (the "2015 Auditor's Report"), the MDEQ was testing Flint River quality since 2006 at the FWTP, but never tested "treated" Flint River water quality as it came out of the consumers' taps.

125.     Corrosion control chemicals should have been used immediately, as corroborated by the 2015 Auditor's Report, which expressly criticized the MDEQ because it did not confer with, or obtain the approval of the EPA when it decided to delay the use of corrosion control chemicals until after the two rounds of monitoring tests.

126.     LAN estimated that the cost of the corrosion control chemicals would have been less

than $100 per day.

127.     From her agency's own data, MDHHS Defendant Wells knew, by late 2014 or early 2015, that there was a dramatic increase in elevated blood lead levels in Flint children, yet failed to report this information and failed to notify the public, and in so doing intentionally concealed critical public health information for more than 10 months.

128.     Corrosion control chemicals should have been used immediately, as corroborated by the 2015 Auditor's Report," which expressly criticized the MDEQ because it did not confer with, or obtain the approval of the EPA when it decided to delay the use of corrosion control chemicals until after the two rounds of monitoring tests.

129.     The cost of the corrosion control chemicals would have been less than $100 per day.

130.     A November 2015 MDHHS report on the Blood Lead Level Test Results for children six years and younger living in Flint Zip Codes 48501-48507, showed  a significant and dangerous spike in the blood lead levels during the second and third quarter of 2014.

131.     From its own data, the MDHHS knew by late 2014 or early 2015 that there was a dramatic increase in elevated blood lead levels in Flint children, yet failed to report this information and failed to notify the public, and in so doing intentionally concealed critical public health information for more than ten months.

132.     MDHHS was aware that the source of the elevated blood lead levels was the Flint River, and that the spike in Legionnaires' disease correlated with the introduction of corrosive Flint River water into the Flint water distribution system. In the months during which Flint distributed water from the Flint River, there was mounting and irrefutable evidence that the Flint River water was not only unfit for human consumption but was actually harming users, including causing the lead poisoning of Flint's children.

133. Thus, by the end of 2014, at the latest, the only reasonable response to the mounting complaints and alarming data was to reconnect the Flint water system to the Detroit water system.

134. Instead, State Actors herein deliberately ignored the protests, exercised deliberate and dangerous denial, offered ineffective solutions and continued to falsely reassure residents of Flint and insist that the water was safe. This, despite the knowledge that the foul taste, odor and appearance was attributable to the highly corrosive Flint River water, untreated with the proper anti-corrosive agents, which caused particulate lead, Legionella bacterial and other toxins to contaminate and befoul the water.

135. Notwithstanding that these conditions constituted a health emergency, the MDHHS failed to report and notify this public health crisis to the MDEQ, the Governor's Office, the EPA or the public and, in fact, intentionally concealed it.

### D.        Other Toxins

136. In the summer of 2014, reported incidents of Legionnaires disease were on the rise in the Flint area, ultimately resulting in 10 deaths in 18 months.

137. Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH range of 5.0 to 8.5, conditions which were all present in the Flint water supply. In addition to lead, Defendants' conduct also caused other harmful toxins to enter Plaintiffs' water supply.

138. By October 2014, the increased threat of deadly Legionnaires disease was adding to the public health safety crisis.[11]

139. On October 17, 2014, Flint officials became aware of the threat of Legionnaires disease resulting from the use of Flint River water.  No action was taken by Flint or Genesee

---

[11] Task Force timeline at 7.

County Health officials.[12]

140.    On October 21, 2014, the MDHHS was notified of the health crisis caused by the Flint River water.  Again no action was taken.[13]

141.    In January 2015, State officials met to discuss the ongoing threat to public health posed by the Legionella bacteria in the Flint River water.[14]  The public health crisis was not addressed in any serious and/or non-frivolous way.

142.    On January 21, 2015, State officials ordered water coolers to be installed in State buildings operating in Flint.  State officials were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was safe to drink the tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.[15]

143.    On January 27, 2015, Flint was placed on notice that the Genesee County Health Department ("GCHD") believed there was an association between the spike in Legionella disease reports and the onset of the use of Flint river water.  Again, Defendants did nothing about the impending health catastrophe.[16]

144.    As In August of 2014, Flint's water tested above legal limits for total coliform and

---

[12] "Genesee Co. Health Department (GCHD) representatives hold conference call with Glasgow and Wright/Flint DPW re:  county's concerns about Legionellosis outbreak and possible connection to city's water system.  DPW "acknowledged that the distribution system has areas of concern."  *Id*. at 7.
[13] "Susan Bohm/MDHHS e-mails GCHD officials re:  Shekter Smith's concern that Flint water would be publicly linked to Legionellosis outbreak in Flint.'  I told her the Flint water was at this point just a hypothesis.'"  *Id*. at 7.
[14] "January 2015 (date unclear):  Staff from Genesee County hospitals, MDHHS, MDEQ and GCHD meet, and MDHHS Director Nick Lyon directs GCHD to conduct and complete its evaluation of the causes of the increased Legionellosis cases that had begun to occur in 2014."  *Id*. at 18.
[15] "MDEQ staff (Prysby, Shekter Smith, Benzie, numerous others) communicate via e-mail re:  decision to provide water coolers at Flint's State Office building.  Some discussion re:  how this decision will affect Flint residents' perceptions of drinking water safety, and how the decision will "make it more difficult … for ODWMA staff."  *Id*. at 8.
[16] "FOIA request sent by GCHD environmental hygienist James Henry to Flint DPW and Flint Mayor for information on water treatment to support the county's investigation of Legionellosis cases."  Task Force Report at 18.

E. Coli bacteria.

145.    In September 2014, Flint again violated the National Primary Drinking Water Regulations Maximum Contaminate Level ("MCL") for total coliform and E. Coli bacteria.

146.    In response, Flint issued boil water advisories on August 16, 2014 and September 5, 2014 and treated the bacterial contamination with additional chlorine.

147.    Defendants had knowledge that adding chlorine to water in corroded pipes was an ineffective treatment for bacteria because it preferentially reacts with the bare metal, stripping away the pipes' protective coating, notwithstanding this knowledge, and that the initial chlorine treatments were ineffective at treating bacteria, more chlorine was added causing additional damage by creating high levels of total Trihalomethane ("THM").

148.    It is well known in the scientific community that high levels of total THM indicates that pipes are unprotected and corroding.

149.    In the summer of 2014, reported incidents of Legionnaires disease were on the rise in the Flint area, ultimately resulting in 10 deaths in 18 months.

150.    Legionnaires' disease is associated with biofilms and corrosion in piping systems, and water with a pH range of 5.0 to 8.5, conditions which were all present in the Flint water supply.

151.    Beginning almost immediately after the Flint River became the primary source of water for the Flint users, the MDEQ and Flint officials were aware of elevated and unlawful levels of THM.

152.    In November of 2014, Defendants recognized and were on actual notice of the need to assess the factors contributing to high levels of THM following the water source change.

153.    After seven months of exposure to elevated THM levels, in January 2015, Flint

water users belatedly received a notice stating that the water was not in compliance with the Federal Safe Drinking Water Act due to unlawful levels of THMs.

154.    In January 2015, within a few weeks of the issuance of the THM notice, Flint City Council member Eric Mays, other Flint Council members and Flint citizens, outraged over the poor water quality approached Emergency Manager Earley, and demanded that Flint reconnect with Detroit water.  Earley refused.

155.    Despite their actual knowledge and a duty to act, Defendants did nothing to correct the foregoing problems and failed to advise Plaintiffs of the dangers presented by the high THM levels.

156.    Despite reconnecting to DWSD water, the deleterious effects of the decision to use the Flint River as Flint's water source persists and has yet to be abated.

157.    While the full extent of the contamination of the water supplied to plaintiffs is not yet known, the bacteria in the water is not limited to E. Coli, and has caused, among other things, skin infections and other dermatological and respiratory injuries.

### E.    Response to Contamination

158.    By January of 2015, representatives of DWSD expressed interest in re-establishing a relationship with Flint and offered to waive the $4 million re-connect fee.

159.    State Actors knew or should have known that DWSD water was the only source of safe, clean water available to Flint, but, acting in concert, rejected this initiative, and deliberately continued to mislead Flint residents to believe that their water was safe.

160.    On or about January 29, 2015, DWSD offered Flint another opportunity to use Detroit water and protect Plaintiffs from known dangers of the toxic water.

161.    Notwithstanding DWSD's overture, Flint, counseled by Defendants, again rejected

this offer, and Defendants deliberately continued to mislead Flint residents to believe that their water was safe.

162.     The Governor's Office was aware of the DWSD offer, and the savings it would provide Flint. EM Earley rejected the offer.

163.     On or about January 29, 2015, DWSD offered Emergency Manager Ambrose another opportunity to use Detroit water and protect Plaintiffs from known dangers of the toxic water.

164.     Ambrose rejected this officer.

165.     On January 29, 2015, State officials recognized that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system. No action was taken to warn the public of the health crisis or to correct the harm caused by the State's decision to switch from DWSD water to Flint River water.[17]

166.     On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the re-connection fee. This offer was rejected by Ambrose.

167.     In January 2015, Flint home owner, Lee Ann Walters, called the EPA regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

168.     By the end of January 2015, the Governor's office was fully aware of the public health emergency cause by the rise in Legionella bacteria found in the Flint River and launched a

---

[17] "Sygo and Shekter Smith/MDEQ e-mail re: Flint water quality problems. Shekter Smith identifies the problem as corrosion across the distribution system rather than a 'premise plumbing' issue. Task Force Timeline at 8.

cover-up of the public health crisis, having been so advised in writing.[18]

169.    On February 1, 2015, the Governor was fully briefed on the health crisis in Flint. Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting and making them visibly sick, the Governor knew that there was an imminent threat to the people of Flint.[19]

170.    Yet, neither the Governor, nor State and local public officials, took corrective action.

171.    On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with DWSD.  Once again Ambrose refused to restore Detroit water for Flint water users.  State and local public officials falsely insisted that the water was acceptable for use and took no action.

172.    On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives.  Crooks noted that alters complained of "black sediment in her water."  She noted that the iron contamination was so high that the testing instruments could not measure it."[20]

173.    In a second email on February 26, 2015, Crooks stated that Miguel Del Toral ("Del Toral") of the EPA is of the opinion that the "black sediment" in the Walters water was

_____

[18] "January 30, 2015:  Brad Wurfel/MDEQ e-mails Dave Murray, Governor Snyder's deputy press secretary, re: *Legionella*, saying he didn't want MDEQ Director Wyant "to say publicly that the water in Flint is safe until we get the results of some county health department trace back work on 42 cases of Legionellosis in Genesee County since last May."  Task Force Report at 18.

[19] "Briefing memo is prepared for Gov. Snyder on Flint water situation, including info on residents' complaints about water quality, Mayor Walling's call for assistance, and MDEQ 'backgrounder' downplaying health risks."  Wurfel:  "It's not like an imminent threat to public health."  Task Force timeline at 9.

[20] Crooks said in her email:  "But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper.  WOW!!!!  Did he find the LEAD!  **104 ppb**.  She has 2 children under the age of 3 … Big worries here … I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant … We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee – would want to dive further into this … she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

actually lead.[21]

174.    On February 27, 2015, Stephen Busch advised Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.[22]

175.    On March 5, 2015, the governor and officials in the governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users. These public officials took no action to warn or otherwise protect Plaintiffs and the Class, and continued to conceal from them and the public the true nature, extent and severity of the public health crisis.[23]

176.    By March 10, 2015, James Henry of the GCHD raised concerns that he was being stonewalled by the State and City in accessing public health information about the Legionella outbreak in Genesee County. The concealment of the public health emergency by City and State officials – Defendants herein – was shocking and unconscionable.

177.    As of March 10, 2015, the defendants knew that the extreme public health emergency involved lead poisoning, deadly Legionella bacteria and a host of other ailments.[24]

---

[21] Crooks stated that "Miguel is wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment – is it phosphates? From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

[22] "Busch/MDEQ responds to Del Toral/EPA saying that the City of Flint 'Has an Optimized Corrosion Control Program,' LeeAnn Walters's house is 'not part of the City's established sample site pool' and the residence has PVC plumbing." Task Force Timeline at 10.

[23] "Officials in Governor's Office and MDEQ begin discussing providing water filters to Flint citizens." *Id.*

[24] "James Henry/GCHD e-mails Howard Croft/Flint DPW, Prysby/MDEQ, Mayor Walling and others citing the city's and state's lack of cooperation and failure to respond to his requests for information – and a Jan. 2015 FOIA – to support county's investigation of potential causes of Legionellosis outbreak in Flint. 'This is rather glaring information and it needs to be looked into now, prior to the warmer summer months when legionella is at its peak and we are potentially faced with a crisis.'" Exhibit B, Task Force Timeline at 9. The Task Force Report highlights the government misconduct which prolonged the danger created by the State when it decided to use the highly corrosive Flint River water. The Task Force stated in its report that "[a]s *the Flint water crisis unfolded, certain state agencies' perceived need to defend the original decision to switch to the Flint River and resist a return to DWSD resulted in public relations and communications efforts that have, at times, been inappropriate. In the spring and summer of 2015, for example, this perceived need to defend a flawed decision manifested itself in attempts by MDEQ and MDHHS to discredit accurate information on lead in drinking water and elevated blood*

178.     On March 25, 2015, Flint City Council voted to re-connect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.[25]

179.     On or about May 6, 2015, employees from EPA Region 5 arrived in Flint and began sampling the water for elevated lead levels. The EPA samples disclosed dangerously and alarmingly high lead levels in excess of 15 ppb, indeed as high as 13,500 ppb, a level twice what is required for classification as hazardous waste.

180.     On June 24, 2015, Del Toral of the EPA prepared a memorandum entitled, "High Lead Levels in Flint Michigan-Interim Report" ("Del Toral Report"). On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

"I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed."

181.     Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

182.     The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), and Michael Prysby.

---

*lead levels provided by outside experts. Citizen concerns were at times derided and dismissed, in spite of the fact that various members of the Governor's staff had expressed – and were expressing – concerns about the water situation in Flint at the same time." ....In any event, the facts in this case point to the reality that state government, as the entity in charge of Flint decision-making, failed to protect the health of the city's residents.* Task Force Report at 37, 40 (Emphasis added.).

[25] The Task Force further notes that in March, 2015, Emergency Manager Ambrose completely ignored numerous alarms and warnings that the Flint River water was dangerous to the health of the Flint water users. "Flint City council votes 7 – 1 to end Flint River service and return to Detroit water service; the vote is non-binding since Flint is under EM control. Flint EM Ambrose: 'It is incomprehensible to me that … Flint City Council would want to send more than $12 Million a year to a system serving Southeast Michigan, even if Flint rate payers could afford it. (Lake Huron) water from Detroit is no safer than water from Flint.'" Task Force Timeline at 10.

183.     Nonetheless, State and local public officials failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by EPA Agent Del Toral.

184.     On June 30, 2015, Mayor Walling notified EPA Region 5 Director, Dr. Susan Hedman ("Hedman") that Del Toral was speaking publicly about the Flint environmental crisis.

185.     On July 2, 2015, Hedman advised Walling that he was given a preliminary draft and that it would be premature to draw any conclusions based on that draft.

186.     On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water.  Parents, worried about the lead poisoning of their children demanded answers from Wurfel.  He told the concerned parents, "[*l*]*et me start here-anyone who is concerned about lead in the drinking water can relax*."  Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

187.     By July 2015, multiple agencies within the State of Michigan, including the Governor, the Governor's Office and MDEQ, had actual notice of high lead exposure and other dangers, including Legionnaires' disease, associated with Flint water.

188.     On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Muchmore, wrote to MDHHS Director Lyon and stated that the Plaintiffs' concerns (and those of the Class and the people of Flint) regarding lead poisoning and other dangers were being "blown off" by the Defendants.

189.     On July 24, 2015, Wurfel continued to promote the cover-up of the health crisis. In response to the recognition that the Defendants were blatantly ignoring the concerns of Flint

residents, he stated, "In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

190.    In August 2015, Professor Marc Edwards of Virginia Tech determined that there was serious lead contamination of the Flint water system and stated that the people of Flint face a major public health emergency.

191.    Professor Edwards also determined that the Flint River water was 19 times more corrosive than the water pumped from Lake Huron by the Detroit water system and that without corrosion control treatment, lead was leaching out from the lead based service lines at alarming rates.

192.    On or about September 2, 2015, Professor Edwards published the results of his studies described above.

193.    Wurfel immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

194.    The increase in elevated blood lead levels in Flint's children, and Wells' failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Wells, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community. Her concealment of this critical information increased the risk and exacerbated the danger.[26]

---

[26] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users. The MDEQ knew its public statement in September about no elevated blood lead levels was false.

195.    Almost immediately following Edwards studies, widespread public demands to re-connect Flint to the Detroit water system were made to the State Actors from, among others, the following national, regional and local public interest groups:

    a.   The ACLU of Michigan,

    b.   The Natural Resources Defense Council,

    c.   The Michigan Chapter of the National Conference of Black Lawyers,

    d.   The Michigan/Detroit Chapter of the National Lawyers Guild,

    e.   The NAACP-Michigan State Conference,

    f.   The Michigan Nurses Association,

    g.   The Democracy Defense League Water Task Force,

    h.   Water You Fighting For,

    i.   Concerned Pastors for Social Action, and

    j.   Coalition for Clean Water and other similar public interest groups.

196.    Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

197.    By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a

---

("July 28, 2015: MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor." Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014. Larder then receives email communication from Peeler: Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint." Task Force Report at 20.

dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time. Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs, their Class or the public.

198.     Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

199.     The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community. His concealment of this critical information increased the risk and exacerbated the danger.[27]

200.     Dr. Mona Hanna-Attisha, in the summer of 2015, using data available to her from Hurley Hospital, observed a similar spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014. She published her study in an effort to alert the community about the health risks associated with drinking Flint River water.

---

[27] The Task Force Report states that in July, 2015, the MDHHS knew that there was a spike in elevated blood lead levels of Flint children which correlated with the onset of the Flint River water as a drinking water source for Flint water users. The MDEQ knew its public statement in September about no elevated blood lead levels was false. ("July 28, 2015: MDHHS epidemiologist Cristin Larder finds that children's blood lead tests conducted in summer 2014 "lie outside the control limit" compared with prior years and that this finding "does warrant further investigation." On the same day, CLPPP data manager Robert Scott analyzes the data over a 5-year period and concludes that "water was not a major factor." Later that day, CLPPP manager Nancy Peeler concludes that the lack of persistently elevated blood lead levels in children in Flint beyond the summer months indicates no connection to the change in water in Flint in 2014. Larder then receives email communication from Peeler: Peeler has concluded from CLPPP data and communicated with MDHHS leadership that there is no problem with children's lead levels in Flint." Task Force Report at 20.

201.     The Defendants and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

202.     In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand.

203.     An example of this type of misleading public statement is found in a MDEQ document entitled, "*DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September 2015*" which stated:   "**Are there other ways the city monitors for lead exposure**? The County Health Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities. The *leading cause of lead poisoning is exposure to lead paint*.   Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the patter of blood lead levels in Flint, compared to the previous three years.  This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community."

204.     On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have re-examined its blood lead level data and the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

205.     On September 28, 2015, Wurfel stated publically that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report.  He said that he wouldn't call her reports "…irresponsible.  I would call them unfortunate."  Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

206.     On September 29, 2015, Wurfel referred to EPA Del Toral as a "rogue

employee."

207.    By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users.  Yet the state deliberately chose not to do so.  Instead, on or about October 2, 2015, State officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

208.    On October 8, 2015, the Governor recognized that he could no longer pretend and perpetuate the myth that the water from the Flint River was safe.  He finally ordered Flint to re-connect with the Detroit water system which contained corrosion control chemicals.

209.    As of or about October 8, 2015, Flint's Eisenhower and Freeman Elementary Schools, along with Brownell/Holmes STEM Academies exceeded 15 ppb for lead -- the safety standard set by the federal government. Students and staff were ordered to drink bottled water only.

210.    The re-connect to DWSD took place on or about October 16, 2015.

211.    On or about December 29, 2015, a special Task Force assigned by Immune Public Official Governor Snyder ("Governor's Task Force") issued its preliminary report which concluded, among other things, that:

    a.    "…we are particularly concerned by recent revelations of MDHSS's apparent early knowledge of yet, silence about, elevated blood lead levels detected among Flint's children."

    b.    "The City of Flint's water customers-fellow Michigan citizens-were needlessly and tragically exposed to toxic levels of lead through their drinking supply."

    c.    "The Flint water crisis never should have happened."

    d.    "We believe the primary responsibility for what happened in Flint rests with the Michigan Department of Environmental Quality (MDEQ). Although

many individuals and entities at state and local levels contributed to creating and prolonging the problem, MDEQ is the government agency that has responsibility to ensure safe drinking water in Michigan. It failed in that responsibility and must be held accountable for that failure."

e.  "The Federal Lead and Copper Rule (LCR) is central to what happened in Flint, because that rule, at least theoretically to the Flint River is designed to prevent lead and copper contamination of drinking water. The federal LCR calls for 'optimized corrosion control treatment,' which the MDEQ did not require in the switch to Flint River….The decision not to require [corrosion control treatment], made at the direction of MDEQ, led directly to the contamination of the Flint water system."

f.  "Throughout 2015, as the public raised concerns and as independent studies and testing were conducted and brought to the attention of MDEQ, the agency's response was often one of aggressive dismissal, belittlement, and attempts to discredit these efforts and the individuals involved….the MDEQ seems to have been more determined to discredit the work of others-who ultimately proved to be right-than to pursue its own oversight responsibility."

212.  On or about December, 29, 2015, Wyant resigned as Director of MDEQ and Wurfel resigned as its Communications Director.

213.  Flint is currently in a State of Emergency: Mayor Karen Weaver declared a State of Emergency on December 14, 2015. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. On January 5, 2016, Governor Snyder declared a State of Emergency. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint. On January 14, 2016, the Governor asked President Barak Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

214.  The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed

mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

215.     The public health crisis was first confirmed by the Genesee County Health Department and the City of Flint on September 25, 2015, when they issued a lead advisory warning city residents about high levels of lead in Flint water.  Governor Snyder belatedly and publicly recognized that Flint residents were potentially exposed to unsafe levels of lead in October 2015.  Once the crisis became public, the value and marketability of property within the City of Flint was immediately and significantly impaired.  Lenders became hesitant to authorize loans for purchase of realty within the City and property values plummeted.

216.     On April 20, 2016, Attorney General Bill Schuette filed criminal charges against Defendants Busch, Prysby and Glasgow in Genesee County.  Criminal charges included criminal common law claims of misconduct in office, conspiracy tampering with evidence and willful neglect of duty, as well as charges for violation of the Michigan Safe Water Drinking Act.

217.     In subsequent testimony before the United States House Oversight Committee in March of 2016, Governor Snyder testified:

   a.   From the day the City of Flint began using the Flint River as an interim water supply on April 25, 2014 – and repeatedly after that – the state Department of Environmental Quality assured us that Flint's water was safe.

   b.   It wasn't.  A water expert at the federal EPA tried to raise an alarm in February 2015, and he was silenced.

   c.   It was on October 1, 2015, that I learned that our state experts were wrong. Flint's water had dangerous levels of lead.

218.     Irrespective of when he first learned of the issue, which Plaintiffs contest, Governor Snyder's testimony establishes that the Michigan Department of Environmental Quality had fraudulently misinformed the citizens of Flint about the dangerousness of drinking Flint water.  The State Defendants did not tell the truth to the citizens of Flint until October of

2015.

219.     Plaintiffs justifiably relied upon the false representations from Defendants that the water was safe and appropriate for use, to their detriment.

220.     Defendants' conduct in misinforming the citizens of Flint about the safety of drinking Flint water between April 25, 2014 and October of 2015 constituted fraudulent concealment pursuant to MCL §600.5855.

### F.  The Private Engineering Defendants' Conduct

221.     LAN was hired to complete an "Operational Evaluation Report," consistent with EPA guidelines, to determine the cause(s) of high levels of total THM and evaluate possible solutions.  EPA guidelines require testing when there is a change in water source or quality, including pH levels, and any change in chemical applications, in dosage or type of chemicals.

222.     Flint also retained Veolia to "review and evaluate the water treatment process and distribution system, provide recommendations to maintain compliance with both state and federal agencies, and assist in implementing accepted recommendations," and to provide an "[e]valuation of the City's process and procedures to maintain and improve water quality," and to provide a "[r]eport that outlines recommendations that will improve the water treatment distribution system."

223.     LAN and Veolia performed their professional duties at a level below the appropriate standard of care employed by engineers of ordinary learning, judgment, and skill.  Both failed to conduct appropriate analysis that would have identified the need for corrosion control. They recommended adding ferric chloride to the Flint water system, which rapidly increased the rate of corrosion and therefore of lead leaching into Flint's drinking water.

224.     LAN issued a report on THM in February 2015, and Veolia issued a report on Flint water quality in March 2015, but neither report included a root cause analysis identifying corrosion

as a cause of THM levels.  A report by engineers of ordinary learning, judgment, and skill would include such an analysis.

225.    The failure to perform an appropriate analysis caused LAN and Veolia to treat elevated THM levels as a disinfection issue, which in turn increased the rate of corrosion in the Flint water system.

226.    Neither LAN nor Veolia investigated the chloride to sulfate mass ratio, which at the levels they were found would have indicated to engineers of ordinary learning, skill, and judgment that the Flint River water is corrosive.

227.    The ineffective treatment of E. Coli with chlorine – of which ineffectiveness LAN and Veolia were aware - should have alerted LAN and Veolia to the existence of corrosion, as the inability to effectively treat E. Coli with chlorine is usually caused by corrosion.

228.    An uptick in reported cases of Legionnaires' disease, publicly announced prior to the retention of LAN or Veolia, was similarly indicative of corrosion and would have put engineers of ordinary learning, skill, and judgment on notice of the problem.

229.    Neither LAN nor Veolia recommended that Flint take any efforts to prevent the growth of legionella, which could have included an assessment of the water quality and installation, operation, and maintenance of systems to protect the installations from sludging, lime scale deposits, and corrosion.

230.    The discoloration of Flint's water should have alerted any engineer of ordinary learning, skill, and judgment that the city's pipes were dangerously corroded, as discoloration and rust are products of corrosion.

231.    Undertaking an appropriate analysis, and performing their professional functions to an ordinary degree of learning, skill, and judgment, would have alerted LAN and Veolia to the

significant corrosion in Flint's water system and the lack of proper corrosion control protocol.

232.    The EPA requires a city such as Flint with lead pipes to maintain corrosion control protocols to protect the public from lead entering drinking water.  The Lead and Copper Rule requires corrosion controls for lead if the 90th percentile of samples exceed levels of 0.015mg/L of lead.

233.    Veolia's statement in its March 2015 report that its "review of water quality records for the time period under our study indicated compliance with State and Federal water regulations" was patently false.

234.    Veolia was aware that Flint did not have a corrosion control protocol, and undermined the importance of installing one by stating that it was unlikely to be effective in addressing the discoloration of the water.

235.    LAN also knew, or should have known, that Flint's water was not compliant with federal regulations and should have alerted the City of Flint to the corrosion in the city's pipes.

236.    LAN and Veolia negligently failed to make the foregoing determinations and negligently failed to perform the appropriate analysis, and as a direct and proximate result, pipes throughout Flint corroded, leading to elevated THM, lead, and bacteria levels, constituting professional negligence.

237.    LAN and Veolia exacerbated the corrosion problem they negligently failed to identify and ameliorate, by recommending the addition of ferric chloride, a potent corrosive acid, without the addition of an alkaline buffer to raise the pH of the water.

238.    Ferric chloride is added at the Water Treatment Plant to bind water impurities together so they settle out of the water at the plant, but without an alkaline buffer will attack the pipes and cause lead and other material to be released into the drinking water.

239.     The addition of an alkaline buffer to ferric chloride treatment is the recognized standard of care, which Veolia and LAN failed to follow.

240.     In its March 2015 report, despite its knowledge that Flint had no corrosion control protocol, Veolia represented that the current ferric chloride dosages were too low and recommended dosages of 100 mg/L or more, but knew or should have known that corrosion was already a serious public health issue in Flint.

241.     In August 2015, LAN recommended increasing the dose of ferric chloride.

242.      The increased ferric chloride dosages caused substantially greater amounts of lead to leach into the Flint water supply.

243.     Both LAN and Veolia analyzed the pH in Flint's water, made recommendations about the addition of chemicals that affect pH, and were both negligent in their analysis of the pH and their recommendations.

244.     LAN and Veolia's reports implicitly and explicitly deemed Flint's water system compliant with federal regulations (despite the knowledge that they were not employing appropriate corrosion controls), and therefor wrongly accorded the City of Flint's water the imprimatur of safety which lead to the false assurances that Flint's water was potable.

**G. Plaintiffs' Harms and Damages**

245.     During the relevant time period, Plaintiffs were unaware of the toxicity and contamination of the water supply they regularly used for drinking, cooking, washing, bathing, showering, dish and clothes washing, which contamination resulted from Defendants conduct and failure to act to protect the community.

246.     The conduct of defendants caused serious and irreparable harm to the residents of Flint. In addition to the harm to the residents, the prolonged exposure of the highly corrosive water

without adequate anti-corrosive agents has irreparably damaged the approximately 15,000 sets of lead and copper plumbing throughout the City of Flint, all of which must now be replaced.

247.    As a proximate result of Defendants' conduct, as set forth herein, Plaintiffs have experienced serious physical and emotional injury and severe and persistent pain and suffering due to their exposure to the toxic water, all currently and into the indefinite future.

248.    Plaintiffs have also sustained property damage including irreparably damaged service line pipes as well as substantial loss in the value of their properties.

249.    As a proximate result of Defendants' deliberate indifference, as set forth herein, Plaintiffs have experienced a seriously diminished quality of life, as well as loss of use and enjoyment of their property, and incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

**H.   Personal and Property Damages Suffered by the Class**

250.    As a direct, proximate and foreseeable cause of Defendants' conduct, Plaintiffs and the Class have suffered extensive personal and property damage.

**1.   Lead's Devastating Health Effects and Other Personal Injuries Caused by Flint's Water Crisis.**

251.    Lead's catastrophic effects are indisputable.  According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults.  A dose of lead that would have little effect on an adult can have a significant effect on a child.  In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

252.    According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment.  Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs.  The neurological and behavioral effects of lead are believed to be irreversible."

253.    The behavioral effects of lead poisoning in children cannot be overstated.  According to many of the leading researchers on lead, increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors and arrests, including arrests involving violent offenses.

254.    Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

255.    The effects of lead exposure are long lasting.  The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium.  During pregnancy, lead is released from bones as maternal calcium and is used to help form the bones of the fetus.  This is particularly true if a woman does not have enough dietary calcium.  Lead can also cross the placental barrier exposing the fetus to lead.  This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

256.    Lead is also harmful to adults.  The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

257.    The costs of lead poisoning are real and substantial. It has been estimated that each case of childhood lead poisoning leads to $5.9 million in medical care costs over the course

of appropriate treatment. Leonardo Trasande and Yinghua Liu, Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008, Health Affairs, 30, no.5 (2011): 863-870.

258.    The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning - typically chelation therapy - as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

259.    Given the long-lasting risks of lead exposure, and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs and the Class will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

260.    Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease.  As explained above, the presence of Legionella was a direct and proximate result of the switch to the Flint River as a water source and related conduct.  At least 87 members of the Class contracted Legionnaires' and at least nine died.  Those members of the Class who became infected with Legionnaires' disease suffered death, and for those who lived, incurred pain and suffering as well as substantial medical costs due to Defendants' conduct.

261.    Finally, as a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered extreme emotional distress.

## 2.    Flint's Children:  Catastrophic Lifetime Losses

262.    Flint's most vulnerable - its children- have suffered the most disastrous consequences from lead exposure- diminished potential over the entire course of their lives.  The World Health Organization states, "[t]hese costs are sometimes referred to as lost opportunity

costs.  Using a conservative estimate, the decrease in intelligence attractable to each 1 μg/dl increase in blood lead level is 0.25 IQ points, and the decrement in lifetime economic productivity associated with lost IQ point is 2.4%.  When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

263.    Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

264.    According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5-year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings."  Michigan Network for Children's Environmental Health, The Price of Pollution:  Cost Estimates of Environment-Related Childhood Diseases in Michigan (June 2010).  This report, of course, does not include estimates of the fallout from Flint's lead crisis.

265.    Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.  See supra, Trasande & Liu.

266.    As a direct and proximate result of Defendants' conduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential.  They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

### 3. Property Damages Caused by Defendants' Conduct

267.     In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendants' conduct, as described above, has caused significant property damage.

268.     The property damages sustained by Plaintiffs and the Class fall into three basic categories. First, the Plaintiff- and Class-owned pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break. Second, the corroded pipes and appliances remain a continuing source of lead and Legionella and other harmful organisms - thus, pipes and appliances must be replaced or else remain a continuing source of harmful exposure. Finally, the value of Plaintiffs' and the Class's real property has been substantially diminished as a result of the continuing need to use bottled water due to the questionable safety of Flint's water and existence of corroded pipes and appliances.

269.     Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this will not render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

270.     The residents' homes have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially Legionella. Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

271.     The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated:

"[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

272.    The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive.  Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

273.    Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater." Moreover, residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

274.    According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household.  Other estimates of those replacement costs are far higher.

275.    Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

276.    Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe.  Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely

compromised. "The corrosion is not going away.  It's still there."

277.    Plaintiffs and the Class have been left to pay for the damage caused by
Defendants.  This has proven nearly impossible as many of the City's residents survive on very
little money.  To make matters worse, the Washington Post has reported that, "many in Flint say
banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and
that the costs are not covered by insurance.  The crisis has created a perfect storm to strip their
houses of their remaining value, they say."

278.    Replacing the piping and affected appliances in each home and business is the
only way to guarantee that a home or business will be unaffected by corrosion and lead.  The
cost of such replacements will range into the tens of thousands, if not more, per structure.

279.    Moreover, the problems associated with Flint's water have had and are having a
significant impact on residential and commercial property values and rental rates in the City.  As
Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already
depressed community is now likely to see housing values plummet not only because of the
hazardous water, but because folks cannot obtain financing."

280.    Certain banks and mortgage companies have refused to make loans, unless the
borrower establishes that its water is potable.  A Wells Fargo & Co. spokeswoman said it is
reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it
will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all
lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged
requiring verification of potable water to provide financing to Flint's residents.  Lenders claim
their hands are tied.  As the Federal Housing Administration, which backs loans to less-
creditworthy borrowers, explained, government regulations require "a continuing and sufficient

supply of safe and potable water" to provide home financing.

281. This creates a true catch-22. Despite having switched back to receiving its water from DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, residents cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

## V. **CLASS ACTION ALLEGATIONS**

282. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 (a), (b)(2) and (b)(3), on behalf of a Class of similarly situated persons and entities, which is defined as follows:

283. All persons and entities that have resided in, owned and/or rented property in, the City of Flint, Michigan since April 25, 2014.

    a. Plaintiffs Tommie Lowery, Sr. and Sandra York represent a sub-class of home owners who live in the home they own in the City of Flint.

    b. Plaintiffs Dorsey Ross, Jr., Eugene Nelson, and Bernie Nelson represent a sub-class of non-Flint-City-resident owners of rental property in the City of Flint.

    c. Plaintiff Tommie Lowery, Sr., on behalf of minor plaintiffs Tommie Lowery, Jr., Isiah Lowery, and Marcus Lowery, represent a sub-class of children who live and lived in Flint and were exposed to the water during the relevant time-period (April 25, 2014 to present).

    d. Plaintiffs Tommie Lowery, Sr. and Sandra York represent a sub-class of residents of Flint who have reached the age of majority and were exposed to the water during the relevant time-period (April 25, 2014 to present).

284. The following persons or entities are excluded from the Class: Defendants; Defendants' parent companies and their subsidiaries, agents or affiliates; Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates; and federal governmental entities and instrumentalities of the federal government including the Judge to whom this case is assigned and the Judge's staff and immediate family.

285. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

286. Plaintiffs believe that there are thousands of Class members located in the United States, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

287. Questions of law or fact common to the Class include:

(a) whether Defendants engaged in the conduct alleged herein;

(b) whether LAN and Veolia committed professional malpractice when they failed to conduct a root cause analysis and recommended Flint double its dosage of ferric chloride without adding a buffering agent and sufficient corrosion control;

(c) whether an optimal corrosion control protocol was implemented, as required by the Safe Drinking Water Act and the Lead and Copper Rule, pursuant to 40 C.F.R. § 141.81(d)(4), since April 25, 2014, when the switch to the Flint River was;

(d) whether the individual defendants were grossly negligent;

(e) whether Defendants "continue[d] to operate and maintain optimal corrosion control treatment", as required by the Safe Drinking Water Act and the Lead and

Copper Rule, pursuant to 40 C.F.R. §141.82(g);

    (f)  whether Defendants knew or should have known that Flint's water supply indicated the presence of lead;

    (g)  whether Defendants knew or should have known that Flint's water supply indicated the presence of legionella;

    (h)  whether Defendants took steps to conceal the presence of lead in Flint's water supply or otherwise falsely assured Plaintiffs and the Class that Flint's water was safe;

    (i)  whether Defendants' conduct violates the Safe Drinking Water Act, the Constitution of the United States, and other laws as set forth herein; and

    (j)  whether the State of Michigan can be held liable for injunctive relief to class members under NREPA (*see* Fifteenth Cause of Action, *infra*)

    (k)  whether Plaintiffs and Class Members are entitled to damages and other monetary and equitable relief, and if so, in what amount and nature.

288.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

289.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' wrongful conduct in that they suffered conduct. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

290.    Plaintiffs are represented by competent counsel with experience in the prosecution

of class actions.

291.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

292.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This action presents no difficulties in management that would preclude maintenance as a class action.

293.    In the alternative, Plaintiffs seek class certification as to particular issues as permitted under Federal Rule of Civil Procedure 23(c)(4).  Plaintiffs seek certification as to the questions identified in Paragraph 224 (a) through (g). Plaintiffs respectfully maintain that the class certification as to these issues is appropriate, as required by the Rule 23(c)(4) because certification as to particular issues provides a superior to any alternative means of adjudication as it eliminates the possibility of duplicative, inefficient litigation of identical issues.

## VI.  CAUSES OF ACTION

### First Cause of Action
### (Professional Negligence - Engineering Defendants)

294.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

295.    LAN and Veolia undertook, for substantial consideration, to render services for the City of Flint which each should have recognized as necessary for the protection of Plaintiffs,

the putative class, and their property, and reasonably could and should have foreseen that the failure to satisfy the standard of reasonable engineering professionals in performing those services would endanger Plaintiffs, the putative class, and their property.

296.     As a result, LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations.  As professional engineers, LAN and Veolia had duties to act as engineers of ordinary learning, judgment, or skill would.

297.     As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.

298.     As a direct and proximate result of LAN and Veolia's negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

**Second Cause of Action**
**(Gross Negligence - All Defendants)**

299.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

300.     Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.  Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to their property.

301.     Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and legionella, to be provided to Plaintiffs and the Class in contravention of federal environmental statutes and guidelines.  As such,

Defendants gross negligently, recklessly, willfully, wantonly, and/or intentionally contaminated drinking water in and around the real property of Plaintiffs and the Class.

302.    The Government Defendants breached their duty by providing and selling Plaintiffs and the Class unusable water that they knew or should have known was contaminated with lead; failing to take remedial measures they knew or should have known would prevent further harm; and failing to warn Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties, despite Governmental Defendants' actual or constructive knowledge that this failure to warn would cause harm.

303.    LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations. As professional engineers, LAN and Veolia had a duty to act as an engineer of ordinary learning, judgment, or skill would. As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control. As a direct and proximate result of LAN's and Veolia's gross negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

304.    Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class.

### Third Cause of Action
### (Negligence - All Defendants)

305.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

306.    Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.

307.     Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

308.     Upon learning of the release of the contaminants, Defendants owed Plaintiffs and the Class a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs, the Class and their property and/or to act reasonably to minimize the damage to Plaintiffs, the Class and their property.

309.     Defendants breached that duty by failing to act reasonably in providing Plaintiffs and the Class usable water.  Furthermore, Defendants failed to take reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after they occurred.

310.     Defendants further breached that duty by failing to timely notify the Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the homes, businesses and rental properties of Plaintiffs and Class Members.

311.     As a result of Defendants' breaches of their duty to timely notify, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

312.     Defendants negligently breached their duties to the Plaintiffs and the Class to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs and Class Members.

313.     Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

314.     LAN and Veolia owed Plaintiffs and the Class a duty to act with reasonable care in undertaking its obligations.  As professional engineers, LAN and Veolia had a duty to act as an engineer of ordinary learning, judgment, or skill would.  As more fully described herein, LAN and Veolia breached their duties of care by (1) failing to conduct a fulsome root cause analysis and (2) recommending the addition of ferric chloride without concomitant corrosion control.  As a direct and proximate result of LAN and Veolia's negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

315.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

### Fourth Cause of Action
### (Intentional Infliction of Emotional Distress - All Defendants)

316.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

317.     Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.  As alleged herein, Defendants intentionally and/or recklessly engaged in conduct that had the direct and foreseeable result of causing Plaintiffs and the Class serious emotional distress. Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.  Defendants knew that Plaintiffs' distress was certain, or substantially certain to result from their conduct, or Defendants acted in deliberate disregard of a high degree of probability that the Plaintiffs and the putative class would suffer emotional distress as a result.

318.     Defendants' outrageous conduct caused severe distress to Plaintiffs and the Class and was the proximate cause of Plaintiffs' injuries.

319.     As such, Defendants breached their duty to exercise reasonable care towards Plaintiffs and the Class.

320.     Plaintiffs and the Class suffered serious emotional distress as a direct and foreseeable result of Defendants' conduct.

**Fifth Cause of Action**
**(Negligent Infliction of Emotional Distress - All Defendants)**

321.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

322.     Defendants owed Plaintiffs and the putative class a duty to exercise reasonable care.

323.     As alleged herein, Defendants failed to exercise reasonable care which had the direct and foreseeable result of causing Plaintiffs and the Class severe emotional distress.

**Sixth Cause of Action**
**(Violation of Safe Drinking Water Act's Notification Requirements - Government Defendants)**

324.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

325.     The Safe Drinking Water Act ("SDWA") was passed by Congress in 1974, with subsequent amendments in 1986 and 1996, to ensure and protect the quality of Americans' drinking water.  Under SDWA, the United States Environmental Protection Agency ("U.S. EPA") is given authority to set the standards for drinking water quality and oversee states, localities, and water suppliers who implement those standards.

326.     Through the SDWA, all public water systems in the United States need to follow the standards and regulations set by the EPA.  U.S.EPA has set maximum contaminant levels and/or treatment technique requirements for over 90 different contaminants in public drinking water, including microorganisms, disinfectants, disinfections by-products, inorganic chemicals, organic chemicals, and radionuclides.

327.     Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

328.     The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. §141.2.

329.     Regulations established under the SDWA require that,"...all water systems must provide a consumer notice of  lead tap water monitoring results to persons served at the sites (taps) that are tested. Any system exceeding the lead action level shall implement the public education requirements." 40 C.F.R, §141.80(g).

330.     Since April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to comply with the requirement that water systems notify customers of the individual results of tap water samples collected and tested for lead within thirty days after the water system receives the results. 40 C.F.R. §§ 141.85(d)(l),(d)(2).

331.     For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs, the Class and those residing at each sampling site of the presence of elevated lead levels in the public water supply.

**Seventh Cause of Action**
**(Violation of Safe Drinking Water Act's Requirement to Operate Optimal Corrosion**
**Control Treatment - Governmental Defendants)**

332.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

333.    Defendants were given written notice of this violation of the Safe Drinking Water Act pursuant to 42 U.S.C. § 300j-8(b) on November 16, 2015, by the Concerned Pastors for Social Action, Melissa Mays, the American Civil Liberties Union of Michigan, and the Natural Resources Defense Council.

334.    The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act.   42 U.S.C. § 300(t); 40 C.F.R. § 141.2.

335.    To address corrosion of lead and copper into drinking water, U.S. EPA issued the Lead and Copper Rule (LCR) under the authority of the SDWA.  42 U.S.C §§ 300(f) to 300j-26; 40 C.F.R. § 141.80-141.91.  One requirement of the LCR is corrosion control treatment to prevent lead and copper from contaminating drinking water.  Corrosion control treatment means utilities must make drinking water less corrosive to the materials it comes into contact with on its way to consumers' taps.  The regulations implementing the LCR, 40 C.F.R. § 141.80- 141.91, "constitute the national primary drinking water regulations for lead and copper.  Unless otherwise indicated, each of the provisions of this subpart applies to community water systems and non-transient, non-community water systems (hereinafter referred to as "water systems" or "systems")."  40 C.F.R. § 141.80(a).

336.    The LCR establishes a treatment technique that includes requirements for corrosion control treatment, source water treatment, lead service line replacement, and public

education. "These requirements are triggered, in some cases, by lead and copper action levels measured in samples collected at consumers' taps." 40 C.F.R. § 141.80(b).

337. The LCR requires systems to monitor drinking water at customer taps. If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion.

338. As described more fully herein, the lead levels in Flint's water exceeded the thresholds established under the LCR.

339. Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment. 40 C.F.R. § 141.82(g).

340. Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

341. The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs and the Class.

342. Additionally, the LCR provides that "[a]ny system exceeding the lead action level after implementation of applicable corrosion control and source water treatment requirements shall complete the lead service line replacement requirements contained in § 141.84." 40 C.F.R. § 141.80(f). A water system must replace annually, at least 7 percent of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system must identify the initial number of lead service lines in its distribution system, including an

identification of the portion(s) owned by the system, based on a materials evaluation, including

the evaluation required under § 141.86(a) and relevant legal authorities (e.g., contracts, local

ordinances) regarding the portion owned by the system. The Government Defendants have yet

to comply with these requirements.

**Eighth Cause of Action**
**Inverse Condemnation - Government Defendants**

343. Plaintiffs incorporate and re-allege each allegation set forth in the preceding

paragraphs of this Complaint.

344. The actions of the Government Defendants, in switching the Flint water system

from water provided by the DWSD to water sourced from the Flint River, constitute an

unconstitutional taking of Plaintiffs' property without due process of law and without just

compensation under Michigan law.

345. Article 10, § 2 of the Michigan Constitution of 1963 provides that "[p]rivate

property shall not be taken for public use without just compensation therefor being first made or

secured in a manner prescribed by law."

346. The Government Defendants caused Plaintiffs' property (including, but not

limited to, underground and interior pipes, plumbing fixtures, and appliances) to be actually and

physically invaded by water containing corrosive chemicals. These chemicals permanently

corroded and rendered useless and valueless Plaintiffs' property, diminished the value of

Plaintiffs' real property, and otherwise encroached on Plaintiffs' use and enjoyment of their

property.

347. The Government Defendants proximately and substantially caused the damage to

Plaintiffs' property set forth in this Count through one or more affirmative acts of introducing

water containing corrosive chemicals into pipes connected with and flowing into Plaintiffs' property.

348.     The Government Defendants undertook the affirmative acts set forth in this Count for a public purpose- namely, to reduce the cost to the City and its residents of providing water to the residents of Flint.

349.     Under Michigan law, there is no governmental immunity for violations of state constitutional rights, including the right to due process and just compensation for takings of property for public use.

350.     Plaintiffs are entitled to just compensation for the diminution in the value of their property caused by the Government Defendants' affirmative acts, in an amount to be determined at trial.

### Ninth Cause of Action
### (Trespass - Government Defendants)

351.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

352.     Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of lead and bacteria to be released into the drinking water for the City of Flint.

353.     Defendants' willful, wanton, and intentional failure to act and/or their affirmative choice of action and following course of action caused lead and bacteria to enter and trespass upon the land and realty of the Plaintiffs and the Class and cause an injury to their possession and/or right of possession.

354.     Upon information and belief, Defendants had exclusive control over the facilities providing Plaintiffs and the Class water at all relevant times.

355. Defendants took affirmative, voluntary, and intentional actions to provide water to Plaintiffs and the Class in an unsafe manner and/or intentionally to release lead and bacteria into Flint's water supply. Further, after such acts, Defendants undertook affirmative, voluntary, and intentional acts that were insufficient to remedy the condition caused by the release of lead and bacteria into the water supply.

356. At the time that the above described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants every reason to know or expect that highly corrosive water would cause large quantities of lead and bacteria to be introduced into the persons and properties of Plaintiffs and Class Members.

357. The above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause lead and bacteria to be disbursed through the water onto the land and property of Plaintiffs and the Class.

358. These voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs and the Class, their property and their right of possession of their property.

359. Further, Defendants' actions in directing the contaminated water into the persons and properties of Plaintiffs and the Class were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

360. Additionally, and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the water supply after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

361.    Further, Defendants' actions that were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for the rights, health and property of Plaintiffs and Class Members.

362.    Based upon the above, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses, and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct, and exemplary or punitive damages.

## Tenth Cause of Action
### (Nuisance - All Defendants)

363.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

364.    Defendants' actions in causing foul, poisonous, lead and bacteria-contaminated water to be delivered to the homes of Plaintiffs resulted in the presence of contaminants in Plaintiffs' properties and/or persons.

365.    Defendants' actions substantially and unreasonably interfered with Plaintiffs' and the Class's comfortable living and ability to use and enjoy their homes, constituting a nuisance.

366.    Neither Plaintiffs nor any member of the Class consented to allow foul, poisonous, lead contaminated water to physically invade their persons or property.

367. Plaintiffs and the Class suffered injuries and damage to their persons and/or properties as a direct and proximate result of Defendants' actions in causing lead contaminated water to be delivered to their homes.

368. Defendants' actions in causing a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their properties constitutes a nuisance and Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

369. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

370. As a direct and proximate result of Defendants' actions, Plaintiffs and the Class have suffered and continue to suffer personal and property damages.

**Eleventh Cause of Action**
**(Procedural Due Process – Individual Defendants)**

371. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

372. In the alternative to the state-law tort claims set forth in this complaint: the Individual Defendants, acting under color of state law, deprived Plaintiffs of their property without providing an adequate post deprivation remedy, in violation of 42 U.S.C. § 1983.

373. At all times relevant to this Complaint, each Individual Defendant acted under the color of state law.

374. The Due Process Clause of the Fourteenth Amendment to the United States Constitution says that no state shall "deprive any person of life, liberty, or property, without due process of law." The Due Process Clause establishes Plaintiffs' constitutional rights to be free from deprivations of private and state-created property interests, without due process of law.

375.     The Individual Defendants, in their actions and omissions, intentionally and/or with deliberate indifference to an unreasonable risk of harm, injured Plaintiffs and deprived them of their constitutionally guaranteed property interests by providing and selling Plaintiffs and the Class unusable water that they knew or should have known was contaminated with lead; failing to take remedial measures they knew or should have known would prevent further harm; and failing to warn Plaintiffs and the Class of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in their homes and rental properties, despite Governmental Defendants' actual or constructive knowledge that this failure to warn would cause harm.

376.     At all times relevant to this Complaint, it was clearly established in the laws of this jurisdiction that no person may, acting under color of state law, deprive citizens of the United States or persons within the territorial jurisdiction thereof of property without due process of law.

377.     Defendants Earley and Ambrose were officials with final policy- making authority for the City of Flint.  Their decisions not to remedy known contamination, and to misinform the public about the safety of Flint water, represented the official policy of the City of Flint.

378.     The Individual Defendants had a custom or practice of providing contaminated water to Flint residents, of not remediating known contamination, and of misinforming the public about the safety of its water systems.

379.     The Individual Defendants had a policy of deliberate indifference to potential harm with respect to the training and supervision of the staff responsible for providing safe drinking water to Flint residents.  In the alternative to the state law tort claims set forth in this Complaint, there exists under Michigan law no meaningful post-deprivation remedy for

Defendants' deprivations of Plaintiffs' liberty and prope1ty interests.

380.     The unlawful acts complained of in this Count proximately caused Plaintiffs to suffer actual physical and emotional damages, as well as other damages and losses. Moreover, the unlawful acts complained of in this Count continue to deprive Plaintiffs of their constitutional rights, and to proximately cause damages, on an ongoing basis.

381.     With respect to the Individual Defendants, Plaintiffs are entitled to compensatory and special damages in an amount to be determined at trial as well as punitive damages. With respect to all Defendants, including Individual Defendants in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

**Twelfth Cause of Action**
**(Substantive Due Process – Individual Defendants)**

382.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

383.     Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

384.     Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

385.     Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public

health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers in violation of 42 U.S.C. § 1983.

386.     Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

387.     This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

388.     The dangers and risks of harm were discreet and special to Plaintiffs, as Flint water users and property owners in particular, and not risks affecting the public at large.

389.     The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

390.     These actions of Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Plaintiffs.

391.     As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs and the Class suffered and continue to suffer violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

a. Serious and in some cases life threatening and irreversible bodily injury;
b. Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;
c. Pain and suffering;
d. Embarrassment, outrage, mental anguish, fear and mortification,

and stress related physical symptoms.

392.     Plaintiffs have further suffered property damage to their homes and/or places of business and/or properties in the form of lost property values and lost business profits.  The conduct of Defendants was reckless and outrageous, entitling Plaintiffs and Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.  With respect to all Defendants, including Individual Defendants in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

**Thirteenth Cause of Action**
**Substantive Due Process – Bodily Integrity**

393.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

394.     Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

395.     The conduct of Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

396.     Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

397.      Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs in violation of 42 U.S.C. § 1983.

398. Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

399. As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this First Amended Complaint, Plaintiffs have suffered, and continue to suffer, violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

> a. Serious and in some cases life threatening and irreversible bodily
> injury;
>
> b. Substantial economic losses from medical expenses, lost wages, lost income,
> lost business profits, reduced property values,
> among others;
>
> c. Pain and suffering;
>
> d. Embarrassment, outrage, mental anguish, fear and mortification,
> and stress related physical symptoms.

400. The conduct of Defendants was reckless and outrageous, entitling Plaintiffs and Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988. With respect to all Defendants, including Individual Defendants in their official capacities, Plaintiffs are entitled to prospective declaratory and injunctive relief from ongoing deprivations of their liberty and property interests.

### Fourteenth Cause of Action
### (Declaratory Judgment Act – All Defendants)

401. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

402.    Plaintiffs are entitled to a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

403.    An actual controversy exists between the parties as alleged herein and will continue to exist unless and until it is resolved by this Court.

404.    Plaintiffs are entitled to a declaratory judgment that the Government Defendants have operated and continue to operate a Water System that is not in compliance with the SDWA and LCR.

**Fifteenth Cause of Action**
**(NREPA (MCL 324.20101 ET SEQ. - Individual Defendants)**

405.    Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

406.    The Flint water system meets the definition of "facility" under the NREPA because it is an area, place or property where a hazardous substance, i.e. lead, in excess of the concentrations which satisfy the requirements of the statute, has been released.

407.    The Defendant State of Michigan was the operator of the facility by virtue of its takeover of the operations of Flint through the Emergency Manager's Act.

408.    Hazardous substances, including lead, have been released from this facility into the environment.

409.    As set forth more fully above, defendants knew that, as a result of their actions, and failure to act, Flint River water distributed to the residents of Flint was not safe to drink or otherwise use, yet knowingly continued to distribute that water.

410.    As more fully described above, defendants, acting on behalf of the State of Michigan, falsely represented that the Flint River water was potable and suitable for use, knowing such statements were false, and intending that plaintiffs and other residents of Flint would rely on those statements in continuing to use the Flint River water.

411.     Response Activity" is defined under the statute to include "the taking of … actions necessary to protect the public health, safety or welfare" and "also includes health assessments or health effect studies carried out under the supervision, or with the approval of the Department of Public Health." MCL 324.20101 (1) (ee).303. Under MCL 324.20135 "a person … whose health or enjoyment of the environment is or may be adversely effected by a release from a facility or a threat of a release may commence a civil action against the operator of a facility for injunctive relief necessary to prevent irreparable harm to the public's health, safety or welfare."

412.     Plaintiffs are persons whose health or enjoyment of the environment is, or may be adversely affected by the release of lead and other toxic contaminants – as set forth more fully above – from the Flint Water System facility and seek the following injunctive relief:

        a.   Medical monitoring;

        b.   Diagnostic testing; and

        c.   Health effect studies.

**Sixteenth Cause of Action**
**(Relief for Diagnostic Medical and Psychological/Counseling Services, Intervention, and Treatment – All Defendants)**

413.     Plaintiffs incorporate every allegation in this complaint as if fully restated herein.

414.     In the alternative, if the foregoing injunctive relief is not available under the Fifteenth Cause of Action above, under NREPA, then for the reasons set forth more fully above and below, the Court should grant the foregoing relief in the exercise of its equitable jurisdiction.

415.     The foregoing is well-documented and publicized, thoroughly covered in the media and easily accessible on the internet. As such, the contamination affecting Flint is well-known within and without this jurisdiction.

416.     The devastating impacts of prolonged exposure and re-exposure to lead and other toxic substances are well known in the scientific and medical community, and are far reaching.

417.     The most obvious and visible damages are to both the infants and adults who were exposed and re-exposed to lead who have suffered damages to bodily organs as a direct result of being continually exposed to Flint's toxic water supply over an extended period of nearly two years.

418.     The less immediately apparent, but equally devastating, damages that will be caused as a direct result of the exposure, and re-exposure to lead have yet to be diagnosed and/or determined.

419.     It is well established both medically and scientifically, that a person with an elevated blood lead level will never fully eliminate this toxic substance from their body.

420.     All plaintiffs have suffered emotional distress as a proximate result of defendant's negligent conduct which has manifested itself in physical and objective symptoms, including but not limited to, the inability to perform ordinary household duties, extreme nervousness and irritability and other symptoms caused by emotional distress, distrust and lack of faith in their government, elected officials, and public infrastructure.

421.     The devastating impacts of prolonged toxic lead exposure are well known in the scientific and medical community, and are far reaching.

422.     These harms may include irreversible brain damage, loss in IQ, and social and developmental issues and deficits which have been undisputedly linked to lead exposure, and further include social and psychological stigma as a result of living in a contaminated community.

423.     Accordingly, as a result of being exposed to lead and other contaminants for an extended period, and as a result of being manipulated and deceived by their own government and its elected and un-elected officials and agents, plaintiffs seek psychological and educational

programs and services, each to be provided at defendants' expense but independently administered.

424. The relief plaintiffs seek is one for which there is no adequate remedy at law.

425. The unique and special circumstances of this case - which include the fact that the government and its agents are responsible for the contamination and exposure, that the government and its agents participated in a cover-up and concealed the contamination and its exposure, and knowingly encouraged Flint residents to consume and use unsafe, unpotable water, the perpetuation and exacerbation of harms as a result of defendants knowing misrepresentations, and the creation of a stigma affecting all plaintiffs – in addition to the inadequacy of any legal remedy to redress the lasting and substantial harms suffered by plaintiffs and the importance of the requested relief in ameliorating those harms.

## VI.  **DEMAND FOR JURY TRIAL**

426. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

## VII.  **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and the Class pray as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

B. That a declaratory judgment be entered that the Governmental Defendants' conduct violated the Safe Drinking Water Act and United States Constitution.

C.     That judgment be entered for Plaintiffs and Class members against Defendants for personal and property damages sustained as a direct and proximate cause of Defendants' conduct, compensatory damages for costs associated with necessary diagnostic medical intervention, treatment and assessment,  psychological intervention and counseling and future medical care; as well as any punitive damages or disgorgement monies owed to Plaintiffs and the Class.

D.     That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law.

E.     That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

F.     That the Governmental Defendants be ordered to remediate its water system to ensure its compliance with Federal and State environmental laws and regulations and to  implement  prospective  remedial  actions to  ensure the future health and safety of Flint residents affected by the crisis.

G.     Fees, costs and such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

*/s/ Esther Berezofsky, Esq.*
Esther Berezofsky, Esq. (*Pro Hac Vice* Pending)
Mark R. Cuker, Esq. (*Pro Hac Vice* Pending)
Christopher Markos, Esq. (*Pro Hac Vice* Pending)
Sarah T. Hansel, Esq. (*Pro Hac Vice* Pending)
WILLIAMS CUKER BEREZOFSKY, LLC
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
(856) 667-0500 (telephone)
(856) 667-5133 (fax)
Email:  eberezofsky@wcblegal.com
        mcuker@wcblegal.com
        cmarkos@wcblegal.com
        shansel@wcblegal.com


*/s/Valdemar L. Washington P-27165*
Attorney for Plaintiffs
718 Beach Street
P.O. Box 187
Flint, MI 48501-0187
810.407.6868 (telephone)
810.265.7315 (fax)
vlwlegal@aol.com


Dated:      February 2, 2017